# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Northampton,        :
             Petitioner        :
       :
           v.        :    No. 1271 C.D. 2020
       :    Submitted: September 20, 2021
Unemployment Compensation        :
Board of Review,        :
           Respondent        :

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge (P.)
                 HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY PRESIDENT JUDGE BROBSON**           **FILED: December 10, 2021**

Petitioner County of Northampton (Employer) petitions for review of an order of the Unemployment Compensation Board of Review (Board), dated December 1, 2020, which reversed a decision by an unemployment compensation referee (Referee), denying benefits pursuant to Section 402(e) of the Unemployment Compensation Law (Law).[1] For the reasons set forth below, we now reverse.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law provides, in part, that "[a]n employe[e] shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work."

# I. BACKGROUND

Valerie L. Makula (Claimant) worked for Employer as a registered nurse from July 23, 2001, until Claimant was suspended from employment on March 27, 2020. (Reproduced Record (R.R.) at 4a-7a.) Employer initially suspended Claimant with pay from March 27, 2020, to April 25, 2020, and without pay beginning April 26, 2020, for a period of six months. (*Id*. at 12a, 18a.) Claimant filed for unemployment benefits on May 10, 2020. (*Id*. at 4a.) In its separation information filed with the Scranton UC Service Center (Service Center), Employer alleged that Claimant was suspended because she engaged in misconduct by "attempt[ing] to organize a work stoppage during the term of a collective bargaining agreement" and that Claimant should have "used the grievance process to address any and all complaints she had about the operation of the nursing home." (*Id*. at 9a-10a.) Claimant cited in her claim for benefits that she was "wrongfully accused" and that "there was no attempt to strike or [stage a] lockout[;] there was no plan for a strike or lockout." (*Id*. at 7a.) The Service Center concluded that Claimant was not ineligible for benefits pursuant to Section 402(e) of the Law because Employer failed to establish that Claimant attempted to organize a walkout. (*Id*. at 20a.) Employer appealed the Service Center's determination, and a Referee conducted a telephonic hearing. (*Id*. at 24a-28a, 55a.) Claimant, Employer's attorney, and three witnesses for Employer attended the hearing. (*Id*. at 55a-57a.)

Employer's first witness, Liz Kelly (Kelly), the director of human resources for Employer, testified that Claimant worked as a registered nurse for Employer for roughly 20 years until she was suspended on March 27, 2020. (R.R. at 57a, 60a-61a.) Kelly stated that on March 27, 2020, Claimant called several other charge nurses who belonged to the same bargaining unit—*i.e.*, who were bound by the same

2

collective bargaining agreement—and discussed concerns that Employer was admitting new residents at a time when COVID-19 was quickly spreading. (*Id*. at 61a.) Kelly noted that Claimant is president of the nurses' union local and that the collective bargaining agreement has a clause concerning a grievance procedure for submitting complaints to Employer. (*Id*. at 61a-62a.) Kelly essentially asserted that Claimant violated the collective bargaining agreement when she raised her and the other nurses' collective complaint outside the grievance procedure process. (*See id*. at 62a-64a.) Kelly further testified that the collective bargaining agreement has a clause prohibiting strikes and walkouts, which is intended to prevent patients from being deprived of consistent care. (*Id*.) Kelly submitted that Claimant also violated this clause when she attempted to organize a walkout or illegal work stoppage among the nurses. (*See id*.)

Employer's second witness, Mary Lou Kaboly (Kaboly), the deputy director of human resources for Employer, testified as to the specifics of Claimant's conduct on March 27, 2020. (R.R. at 57a.) Kaboly recalled that Claimant was placed on administrative leave that day after a conversation with Employer's administrator where Claimant had allegedly told the administrator that if she was going to walk out of work, she would not be walking out alone—*i.e.*, that Claimant threatened a work stoppage. (*Id*. at 65a.) Kaboly subsequently conducted an investigation during which she interviewed Claimant regarding her conversation with Employer's administrator. (*Id*. at 65a-66a.) Claimant admitted to Kaboly that, while she had not threatened a walkout, she intended a "peaceful demonstration, a show of solidarity." (*Id*. at 66a.) Based on her conversation with Claimant, Kaboly believed that Claimant was attempting to induce or encourage other nurses to "walk away from their workstations and walk out of the building." (*Id*.)

3

Claimant then testified as to the circumstances surrounding her conduct on March 27, 2020, as follows:

> I was approached by a nurse who had some concerns about something that was going on [i]n her unit relative to a resident that was new to the facility and the person had been . . . tested for COVID-19. At that point we weren't getting results for COVID-19 [tests] immediately, but . . . the resident was returned to the facility and put on a unit with the general population. So[,] this nurse was concerned. As [I am] the union president, she did bring that concern to me.
>
> . . . .
>
> [T]hen I called [Employer's administrator] to have a discussion . . . . . . . In the course of that phone conversation . . . [I] ask[ed] . . . why we [we]re not quarantining residents that we don't know are positive or negative [for COVID-19] . . . and [it became] a heated conversation . . . . I was then . . . told . . . that if I wanted to go home[,] I should go[—*i.e.*, that] if I wasn't comfortable being there I should just leave. I then did say I'm sure I won't be going alone. They took that . . . as a threat. There was no walkout. There was not stoppage of work. We do get to leave our nursing units to go to lunch. And . . . I never left my unit because I was on the phone. . . . [T]en minutes later I was escorted out of the facility.

(R.R. at 70a-71a.) Claimant further insisted that, while she discussed the issue with the other nurses, she did not induce or encourage them to engage in a walkout or work stoppage:

> I did reach out to nurses. I asked them how they were feeling about what was going on at [Employer], and that is when I asked them if they would be willing to go to [the] administration together as a group to discuss our concerns. I never used the term walkout, and[,] in fact, I went as far as saying to . . . the nurses . . . that this was not about anyone losing their job, this was not about anybody abandoning any residents. I've worked for the facility for 19 years. I would never consider abandoning the residents I've been taking care of.

(*Id*. at 71a.) She stated that she talked to multiple nurses because she did not want to raise the issue with Employer if the concern was isolated, but she found that others

4

had the same concern. (*See id.* at 73a.) Claimant further clarified her statement to Employer's administrator regarding not walking out alone, saying that she only meant that if other nurses were being yelled at or treated in the same way she was, that other nurses likely would have walked out as well. (*Id.*)

Kelly testified that after the internal investigation was conducted and Claimant was placed on a temporary suspension, Employer conducted a *Loudermill* hearing[2] to determine what discipline Claimant would receive for violating the collective bargaining agreement. (R.R. at 63a.) Claimant was joined at the hearing by her union representatives, and Employer was represented by the county nursing home administrator and its director of nursing. (*Id.*) After the hearing, the decision was made that Claimant would not be terminated but that she would face a six-month suspension without pay. (*Id.*) Kelly stated that Claimant and Employer subsequently entered into a settlement agreement to memorialize the hearing's outcome, wherein it was established that Claimant had "contacted at least four other nurses . . . and discussed what those nurses refer[red] to as a walkout[,] which meant that they would be leaving their nursing units for some amount of time." (*Id.* at 63a-64a.) Claimant further agreed, *inter alia*, that she would not "attempt to organize a walkout or any kind of activity that might involve nurses leaving their nursing units instead of using the grievance procedure[,] which is supposed to be used for that purpose." (*Id.* at 64a.) In her testimony, however, Claimant maintained that she only signed the settlement agreement because she wanted to return to her position with Employer and she felt she had no other choice. (*Id.* at 72a.)

---

[2] A *Loudermill* hearing is a pre-termination hearing given to a public employee that is required by due process, as established in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

5

After the hearing, the Referee issued a decision, concluding that Claimant was ineligible for benefits pursuant to Section 402(e) of the Law. (R.R. at 78a-80a.) The Referee found that Claimant intended to threaten Employer with a walkout, that she led Employer to believe she was encouraging "a peaceful demonstration and show of solidarity," and that her actions were in violation of the collective bargaining agreement. (*Id.* at 80a.) Claimant's conduct, therefore, constituted willful misconduct under Section 402(e) as being in violation of a work rule—*i.e.*, the collective bargaining agreement. (*Id.*)

Claimant appealed the Referee's decision, and the Board reversed. In so doing, the Board issued the following findings of fact:

1. [C]laimant was last employed by [Employer] as a full-time registered nurse from July 2001 until March 27, 2020 . . . .

2. [C]laimant was aware that [E]mployer has a term in its collective bargaining agreement that provides: "The [u]nion agrees that there shall be no strikes, slowdowns, or other interruption[s] o[f] work by any of its members during the term of this [a]greement, but that any disputes or differences shall be taken up under the [g]rievance and [a]rbitration [process] of this [a]greement."

3. On March 27, 2020, a nurse complained to [C]laimant about issues related to patients positive for COVID-19 being placed on a unit with general patients.

4. [C]laimant called other nurses about the complaint to see if others felt the same way and to see if they would be willing to go to [Employer's] administration as a group with their complaint.

5. [C]laimant called [Employer's] administrator and communicated the complaint.

6. The conversation became heated[,] and the administrator told [C]laimant that she could leave if she did not feel like working.

7. [C]laimant responded that if she left, she would not be the only one to walk out.

6

8. [C]laimant was later questioned about what she meant by her comment[,] and [C]laimant told the administrator that she intended a "peaceful demonstration and stand of solidarity" and refused to explain further.

9. [E]mployer and [C]laimant entered into a settlement agreement and [E]mployer suspended [C]laimant without pay for six months.

(Board's Decision at 1-2.) The Board reasoned:

The Referee in this case denied benefits because "[C]laimant's actions and comments showed that she intended to threaten [E]mployer with a walkout[,]" and the Referee concluded that [Claimant's actions] . . . violated [E]mployer's policy[—*i.e.*, the collective bargaining agreement]. However, the [collective bargaining agreement] does not cover a person's "intentions"[—]only the act of a strike, slowdown, or walkout. Further, *the Board credits [C]laimant's testimony that when she spoke with the other nurses, she was only asking them if they would be willing to approach the administration as a group with their complaints and [that she was] not organizing a strike*. The Board concludes [C]laimant did not violate [the collective bargaining agreement] prohibiting strikes, slowdowns, and walkouts[.] [T]hus, [Claimant] is [not in]eligible for benefits under Section 402(e) of the . . . Law.

(*Id.* at 2 (emphasis added).) Employer now petitions this Court for review.

## II. ISSUES

On appeal, Employer essentially contends that (1) the Board capriciously disregarded relevant evidence of the settlement agreement when rendering its findings of fact, and (2) the Board erred as a matter of law in concluding that Claimant did not engage in willful misconduct because the settlement agreement constitutes an admission that Claimant violated the collective bargaining agreement.

## III. DISCUSSION

### A. Capricious Disregard

Employer essentially contends that the Board's finding that Claimant "only" spoke with the other nurses about approaching Employer to raise a collective

complaint concerning the patients and COVID-19—and not to organize or encourage a walkout—is contradicted by the settlement agreement evidence, which evidence Employer alleges the Board capriciously disregarded. According to Employer, the settlement agreement establishes that Claimant went outside the grievance procedure and attempted to encourage an illegal work stoppage among several nurses. Employer, therefore, argues that the Board capriciously disregarded this evidence in rendering its findings of fact because it is competent and relevant in demonstrating that Claimant engaged in willful misconduct. The Board did not address the settlement agreement in its decision below or in its brief on appeal to this Court.

Generally, this Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa. C.S. § 704. We may also, however, "[d]isturb[] an agency's adjudication for a capricious disregard of evidence . . . where the factfinder has refused to resolve conflicts in the evidence, has not made essential credibility determinations[,] or has completely ignored overwhelming evidence without comment." *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1263 (Pa. Cmwlth. 2015). "When determining whether the Board capriciously disregarded the evidence, the Court must decide if the Board deliberately disregarded competent evidence that a person of ordinary intelligence could not conceivably have avoided in reaching a particular result, or stated another way, if the Board willfully or deliberately ignored evidence that any reasonable person would have considered to be important." *Bennett v. Unemployment Comp. Bd. of Rev.*, 33 A.3d 133, 136 n.3 (Pa. Cmwlth. 2011) (quoting *Jackson v. Unemployment Comp. Bd. of Rev.*, 933 A.2d 155, 156 n.4 (Pa. Cmwlth. 2007)).

8

The settlement agreement provides, in pertinent part:

> During [the term of] a [collective bargaining agreement] containing [a] "[n]o [s]trike" clause . . . , and *instead of using the grievance procedure contained in the same [c]ollective [b]argaining [a]greement to resolve . . . dispute[s]*, [Claimant] chose to inform [Employer] on March 27, 2020, that, "[i]f I walk out, I won't be walking out alone." *Furthermore, confirming [Claimant's] intention, [Claimant] contacted at least four other [n]urses . . . and discussed what those nurses referred to as a "walkout," which meant that they would be leaving their nursing units for some amount of time.*

(R.R. at 42a (emphasis added).) It is clear to this Court that this language constitutes an admission that Claimant attempted to encourage an illegal work stoppage, in contradiction of the Board's finding that Claimant "only" spoke to the other nurses concerning raising a collective complaint. Nevertheless, the Board failed to consider the settlement agreement in its entirety despite the fact that it was properly made part of the record at the Referee hearing and a reasonable person would have considered the evidence. Based on the foregoing, we agree with Employer that the Board capriciously disregarded the settlement agreement evidence. *Bennett*, 33 A.3d at 136 n.3.

## B. Settlement Agreement and Willful Misconduct

Employer next asserts that the settlement agreement constitutes an admission that Claimant failed to follow the grievance procedure and attempted to encourage an illegal work stoppage among several nurses in violation of the terms of their collective bargaining agreement. Employer notes that in *Davis v. Unemployment Compensation Board of Review*, 426 A.2d 753 (Pa. Cmwlth. 1981), this Court "upheld the admission of a signed statement by an employee" admitting to willful misconduct. (Employer's Brief at 20.) Employer further alleges that Claimant has not demonstrated that she was coerced into signing the settlement agreement, which

9

Employer notes is her burden to establish pursuant to the precedent of this Court. Employer, therefore, contends that the settlement agreement is a clear admission that Claimant violated the collective bargaining agreement and committed willful misconduct.

An employer bears the burden to prove that it discharged an employee for willful misconduct. *Adams v. Unemployment Comp. Bd. of Rev.*, 56 A.3d 76, 78-79 (Pa. Cmwlth. 2012). This Court has held that an employee who violates a collective bargaining agreement "by participating in an illegal work stoppage ha[s] engaged in willful misconduct and [is] . . . ineligible to receive benefits . . . ." *DiVergigelis v. Unemployment Comp. Bd. of Rev.*, 547 A.2d 513, 515 (Pa. Cmwlth. 1988). An employee's *encouragement* or *inducement* of an illegal work stoppage similarly constitutes willful misconduct under Section 402(e) of the Law. *Hussar v. Unemployment Comp. Bd. of Rev.*, 432 A.2d 643, 646 (Pa. Cmwlth. 1981). Furthermore, employees "are required to avail themselves of contractual, legal, or equitable remedies for the settlement of disputes with their employers" as opposed to a stoppage of work or voluntarily quitting their employment. *Westinghouse Elec. Corp. v. Unemployment Comp. Bd. of Rev.*, 144 A.2d 673, 676 (Pa. Super. 1958).

The facts of this case are similar to this Court's opinion in *Davis*. There, an employee was accused of stealing store merchandise, and, during questioning, the employee signed a statement admitting to the theft. *Davis*, 426 A.2d at 754. This Court upheld a finding by the Board that the signed admission form was sufficient to establish that the employee engaged in the willful misconduct in question. *Id.* at 755. In so doing, this Court noted that the burden of proving that an admission was coerced lies with the admitting party. *Id.* We, therefore, rejected the employee's

allegation that the employer had failed to show that the admission was *not* coerced. *Id.*

In light of our capricious disregard analysis above, we agree with Employer that the settlement agreement constitutes an admission that Claimant engaged in willful misconduct. The text of the settlement agreement is clear in establishing that Claimant admitted to raising a complaint outside the grievance procedure and to inducing or encouraging at least four other nurses to participate in a walkout. The settlement agreement further demonstrates that Claimant accepted that her actions were in violation of the collective bargaining agreement. Notwithstanding the Board's credibility determinations and other findings to the contrary, this admission is sufficient under our precedent to establish that Claimant engaged in willful misconduct. *Davis*, 426 A.2d at 755. Claimant has not at any point alleged that she was coerced into signing the admission statement. As noted above, the burden lies with Claimant to establish coercion. *Id.* Thus, because coercion is not at issue here and the settlement agreement establishes that Claimant violated the collective bargaining agreement, it is clear that Claimant committed willful misconduct under Section 402(e) of the Law. *See DiVergigelis*, 547 A.2d at 515; *Westinghouse*, 144 A.2d at 676.

## IV. CONCLUSION

For the reasons set forth above, the order of the Board is reversed.

P. KEVIN BROBSON, President Judge

11

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Northampton,                     :
                         Petitioner        :
                                           :
              v.                           :   No. 1271 C.D. 2020
                                           :
Unemployment Compensation                  :
Board of Review,                           :
                        Respondent         :

# **O R D E R**

AND NOW, this 10th day of December, 2021, the order of the Unemployment Compensation Board of Review is hereby REVERSED.

 

 

_____
P. KEVIN BROBSON, President Judge